IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CHRISTA R.,[1]

    Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

Case No. 3:21-CV-01688-NJR

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423.

## BACKGROUND

Plaintiff applied for benefits in December 2019, alleging disability beginning in November 2018. After holding a hearing, an Administrative Law Judge (ALJ) denied the application in June 2021. (Tr. 54-67). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final agency decision subject to judicial review. (Tr. 1). Accordingly, Plaintiff exhausted administrative remedies and filed a timely complaint.

## ISSUES RAISED BY PLAINTIFF

Plaintiff raises the following issues:

1.    The ALJ erred by failing to account for deficits of concentration within the residual functional capacity (RFC) finding.

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

      2.      The ALJ erred by failing to account for social functioning deficits within the same finding.

(Doc. 10, p. 3).

## LEGAL STANDARD

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his or her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings

of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ..." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). While judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

1. **Evidentiary Hearings**

Plaintiff was represented by an attorney at the hearing in April 2021. (Tr. 72). At the hearing, Plaintiff disagreed that she could read, write, and do simple math. (Tr. 87). When asked what is stopping her from working a full-time job, Plaintiff answered that "[m]ost of it is physical." (Tr. 89). Plaintiff also explained that she has "a lot of focus and concentration

issues and vision issues." (*Id.*). For example, Plaintiff noted that she is only able to do adult coloring for "maybe 10 minutes or 15." (Tr. 92).

A VE also testified. The ALJ asked the VE a hypothetical question which corresponded to the RFC assessment—would there be work for an individual limited in "the ability to lift and carry up to 20 pounds occasionally and 10 pounds frequently, can stand and walk up to two hours in an eight-hour workday and can sit up to six hours in an eight-hour workday." (Tr. 97-98). The ALJ's hypothetical included the additional limitations:

- occasionally climbing ramps and stairs;
- never climbing ladders, ropes, and scaffolds;
- frequently stooping, occasionally kneeling, crouching, and crawling;
- avoiding concentrated exposure to extreme cold, heat, wetness, humidity, noise (noise level 3 is acceptable), vibration, as well as fumes, odors, dusts, gases, poor ventilation, and hazards such as moving machinery and unprotected heights;
- performing only jobs that can be learned in 30 days or less;
- making only simple work-related decisions;
- tolerating only occasional contact with supervisors and the general public; and
- occasional changes to the work processes and procedures.

(Tr. 98).

The VE testified that based on this hypothetical "the individual would be limited to sedentary, unskilled work." (*Id.*). As a result, there are approximately 22,000 hand packer positions, 25,000 sedentary unskilled production worker positions, and 12,000 sedentary unskilled inspector tester sorter positions nationally. (*Id.*). The ALJ added to the hypothetical whether the sedentary jobs described above could still be done if the individual can

"frequently handle, finger and feel with the bilateral upper extremities . . . ." (Tr. 99). The VE confirmed that the same jobs described above could still be done, but there would be no other work available if the individual could only *occasionally* handle, finger, and feel with the bilateral upper extremities. (*Id.*).

The ALJ then asked whether the same jobs would be available if an individual is absent from work three times per month on a regular and consistent basis. (Tr. 99-100). The VE confirmed that those jobs would not be available. (Tr. 100). The ALJ asked whether an individual could maintain competitive employment if the individual was to be off task more than 20 percent of the workday on a regular and continuous basis. (*Id.*). The VE answered, "[n]o, it would soon result in termination." (*Id.*). Plaintiff's counsel only asked whether the VE had an "opinion as to the tolerance for absenteeism in unskilled employment[.]" (*Id.*). The VE answered that "even one absence in a one-month period that occurred over two consecutive months would result in termination or two or more absences." (*Id.*).

  2. **Medical Records**

In February 2019, Plaintiff went to Michael Stotler, M.D. ("Dr. Stotler") with complaints of stress and depression. (Tr. 450). During her visit, Dr. Stotler conducted a mental status exam. The mental status exam showed Plaintiff's "[r]ecent and remote memory intact, [a]ttention and concentration adequate." (*Id.*). Plaintiff's thought process was logical and coherent. (*Id.*). Dr. Stotler observed that Plaintiff had good insight and judgment. (*Id.*). Plaintiff was diagnosed with bipolar disorder and prescribed psychotropic medication. (*Id.*).

In April 2019, Plaintiff went to Dr. Stotler with complaints of stress. (Tr. 448). During her visit, Dr. Stotler conducted a mental status exam. The mental status exam showed Plaintiff's "[r]ecent and remote memory intact, [a]ttention and concentration adequate." (*Id.*).

Plaintiff's thought process was logical and coherent. (*Id*.). Dr. Stotler observed that Plaintiff had good insight and judgment. (*Id*.).

In July 2019, Plaintiff had an office visit with Cheryl Faber, M.D. ("Dr. Faber"). (Tr. 661). Plaintiff reported that "her current psychiatrist, Dr. Stotler, might not see her anymore because of too many missed appointments." (*Id*.). During Dr. Faber's mental status exam, she noted that Plaintiff follows commands, and her language expression, comprehension, memory, concentration, and insight were good. (Tr. 666).

In September 2019, Plaintiff had a follow-up visit with Dr. Faber. (Tr. 654). Dr. Faber observed that Plaintiff "definitely needs psychiatric care." (*Id*.). She "reminded that [Plaintiff] absolutely needs a psychiatrist." (*Id*.). During Dr. Faber's mental status exam, she noted that Plaintiff follows commands, and her language expression, comprehension, memory, concentration, and insight were good. (Tr. 659).

One month later, Plaintiff had another office visit with Dr. Faber. (Tr. 647). Dr. Faber "urged her to make an appointment with a new psychiatrist [because] [h]er previous psychiatrist will no longer see her because of too many missed appointments." (*Id*.). During Dr. Faber's mental status exam, she noted that Plaintiff follows commands, and her language expression, comprehension, memory, concentration, and insight were good. (Tr. 652).

In early January 2020, Plaintiff saw Dr. Faber. (Tr. 640). Plaintiff still needed to find a new psychiatrist. (*Id*.). Dr. Faber provided Plaintiff a list and "insist[ed] that she make an appointment as soon as possible." (*Id*.). During Dr. Faber's mental status exam, she noted that Plaintiff follows commands, and her language expression, comprehension, memory, concentration, and insight were good. (Tr. 645). Later in January, Plaintiff had a follow-up with Dr. Mork. (Tr. 882). Dr. Mork's exam noted that Plaintiff was "at times inconsolable."

(*Id.*). He also observed that Plaintiff had paranoid thoughts. (*Id.*). Dr. Mork noted the following when assessing Plaintiff's bipolar:

> [V]ery poorly controlled mental health issues when combined with her physical ailments are becoming progressively worse. She has not been able to establish with a new psychiatrist since Dr. Stotler. She is very resistant to seeing another psychiatrist as feels they just want to throw her into an insane asylum or push more medicines at her. Discussed thoroughly that this is not the goal. Expressed my concern of her leaving the office again with information on how to obtain mental health treatment and not have follow-up until I see her next.

(*Id.*).

In February 2020, Plaintiff saw Dr. Ahmed and Angela Anderson, a counselor at Mercy Hospital St. Louis, for a behavioral health assessment. (Tr. 689-696). Plaintiff was alert, oriented, irritable, and "somewhat cooperative." (Tr. 690). Plaintiff's behavior was "calm; cooperative; suspicious; guarded; good eye contact." (*Id.*). Her thought processes were logical, but her insight and judgment were poor. (*Id.*). Plaintiff stated during this assessment that she uses marijuana and cocaine occasionally to help with symptoms. (*Id.*).

A month later, Plaintiff saw Dr. Stotler for her peripheral neuropathy. (Tr. 446). During her visit, Dr. Stotler conducted a mental status exam. The mental status exam showed Plaintiff's "[r]ecent and remote memory intact, [a]ttention and concentration adequate." (*Id.*). Plaintiff's thought process was logical and coherent. (*Id.*). Dr. Stotler observed that Plaintiff had good insight and judgment. (*Id.*). Later in March 2020, Plaintiff was seen by Dr. Faber. (Tr. 633). Dr. Faber observed that Plaintiff "should [still] find a psychiatrist, although that has been a challenge." (*Id.*). During Dr. Faber's mental status exam, she noted that Plaintiff follows commands, and her language expression, comprehension, memory, concentration, and insight were good. (Tr. 638). Plaintiff had a telemedicine visit with Dr. Faber in June 2020.

(Tr. 699). Dr. Faber observed that Plaintiff's "[c]ognitive assessment demonstrates normal language, memory, fund of knowledge and insight." (Tr. 704).

In July 2020, Sarah Ducey, Ph.D. ("Dr. Ducey") conducted a psychological exam and mental status evaluation. (Tr. 678-684). Dr. Ducey observed that Plaintiff's demeanor was "sometimes defensive, hostile, and irritable." (Tr. 681). "Her overall presentation and manner of relating was poor." (*Id.*). Plaintiff's thought processes were circumstantial and tangential. (Tr. 682). She was oriented to person, place, and time. (*Id.*). Dr. Ducey recorded that Plaintiff's attention and concentration were "[i]mpaired due to emotional distress secondary to both depression and physical pain and discomfort." (*Id.*). Also, Plaintiff's recent and remote memory skills were "[i]mpaired due to emotional distress secondary to depression and physical pain." (*Id.*). Plaintiff's insight was fair to poor. (Tr. 683). Dr. Ducey noted that Plaintiff had moderate limitations in adapting and managing herself—and in understanding, remembering, or applying information. (*Id.*). Dr. Ducey also observed that Plaintiff had marked limitations in concentration, persistence in pace, and when interacting with others. (*Id.*).

A couple of months later, in October 2020, Plaintiff had a medication review appointment with Ritesh Gandhi, M.D. ("Dr. Gandhi"). (Tr. 895). Dr. Gandhi observed that Plaintiff displayed an abnormal stance and abnormal gait. (Tr. 903). However, Plaintiff's judgment and affect were normal. (Tr. 904). In December 2020, Plaintiff had an appointment with Richard Brian Sommerville, M.D. ("Dr. Sommerville"). (Tr. 786). Dr. Sommerville went in extreme detail of Plaintiff's spontaneous speech. (Tr. 786-787). At one point, Dr. Sommerville noted:

> I asked her what her medications are. She avoids the question but declares that I am now responsible for her neurological medications, as per her PCP. I told her that's not how it works. I am first going to be working to make a diagnosis but I am not suddenly responsible for filling her medications.

(Tr. 787). Dr. Sommerville conducted a mental status exam noting the following:

> The patient is alert. She does not make eye contact. She is hunched in a wheel chair and speaks in a slow monotone and rambles in a tangential manner. Speech is littered with profanities. At times she laughs while talking. She has a disheveled appearance. At times it is quite difficult to follow her train of thought. She goes on and on without prompting to complain about her life and how poorly she feels she is being treated by the ex-husband and others with whom she is living. She states that she feels isolated, malnourished, neglected, emotionally abused.

(Tr. 792). Dr. Sommerville also explained that "[i]t is impossible in the time allotted for me to synthesize a history or get a distinct clinical impression due to the profundity of her obvious psychiatric or personality challenges as well as lack of records." (Tr. 793).

In January 2021, Dr. Gandhi had a follow-up visit with Plaintiff. (Tr. 934). Dr. Gandhi observed that Plaintiff's affect was labile. (Tr. 942). According to Dr. Gandhi, Plaintiff was agitated and exhibited a depressed mood. (*Id.*). Plaintiff also exhibited disordered thought content. (*Id.*). A month later, Dr. Gandhi noted that Plaintiff's judgment was normal. (Tr. 962). Later in February 2021, Vivek Prasad, M.D. ("Dr. Prasad") had a video call with Plaintiff. (Tr. 807). Dr. Prasad observed Plaintiff had a depressed mood and tearful affect. (*Id.*). Dr. Prasad found that Plaintiff was "[s]omewhat attention seeking . . . ." (*Id.*).

3. **State Agency Consultants' Mental RFC Assessment**

In September 2020, M. W. DiFonso, Psy.D. ("DiFonso"), assessed Plaintiff's mental RFC based on a review of the record. DiFonso found that Plaintiff had sustained concentration and persistence limitations. (Tr. 159). DiFonso also noted that Plaintiff's ability to maintain attention and concentration for extended periods was moderately limited.

(Tr. 160).

In October 2020, Joseph Mehr, Ph.D. ("Mehr"), the second state agency consultant, agreed with DiFonso's opinion. Mehr found that Plaintiff had sustained concentration and persistence limitations. (Tr. 178). He also noted that Plaintiff's ability to maintain attention and concentration for extended periods was moderately limited. (*Id.*).

### DECISION OF THE ALJ

The ALJ followed a five-step sequential evaluation process for determining whether Plaintiff is disabled. The ALJ determined that Plaintiff had "not engaged in substantial gainful activity since December 9, 2019, the application date." (Tr. 56). The ALJ also found that Plaintiff had the following severe impairments: bipolar disorder, generalized anxiety disorder, post-traumatic stress disorder, migraine headaches, allergic rhinitis, and small fiber neuropathy. (*Id.*).

The ALJ found that Plaintiff had the RFC to perform light work, but with the following limitations:

a) work where the individual can lift or carry up to 20 pounds occasionally and 10 pounds frequently;

b) work where the individual can stand or walk up to 2 hours in an 8-hour workday;

c) work where the individual can sit up to 6 hours in an 8-hour workday;

d) occasionally climbing ramps and stairs;

e) never climbing ladders, ropes, and scaffolds;

f) frequently stooping, occasionally kneeling, crouching, and crawling;

g) avoiding concentrated exposure to extreme cold, heat, wetness, humidity, noise (noise level 3 is acceptable), vibration, as well as fumes, odors, dusts, gases, poor ventilation, and hazards such as moving machinery and

>   unprotected heights;
>
>   h) frequently handling, finger, and feel with the bilateral upper extremities;
>
>   i) performing only jobs that can be learned in 30 days or less;
>
>   j) making only simple work-related decisions;
>
>   k) tolerating only occasional contact with supervisors and the general public; and
>
>   l) occasional changes to the work processes and procedures.

(Tr. 59). The ALJ found that Plaintiff had no past relevant work. (Tr. 66). Based on the testimony of the Vocational Expert ("VE"), the ALJ found that Plaintiff was not disabled because she was able to do other jobs that exist in significant numbers in the national economy. (*Id.*).

## DISCUSSION

**I.   Failing to Account for Deficits of Concentration, Persistence, or Pace ("CPP") in the RFC**

The Seventh Circuit has "observed a recurring error: ALJs would limit a claimant to 'unskilled work' and conclude that by doing so they had incorporated a claimant's full range of CPP limitations—challenges concentrating, staying on task, and maintaining a given pace in the workplace." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). "In this area of the law, 'unskilled work' is a term of art (indeed one defined by regulations) and refers to tasks that are not complex and do not take long to learn." *Id.* (citing 20 C.F.R. § 404.1568(a)). The Court has "labored mightily to explain, however, the relative difficulty of a specific job assignment does not necessarily correlate with a claimant's ability to stay on task or perform at the speed required by a particular workplace." *Id.* (citing *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019)). "Put another way, someone with problems concentrating may not be able to complete

a task consistently over the course of a workday, no matter how simple it may be." *Id*. at 374.

When an ALJ tailors an RFC to an individual's "CPP limitations without assuming that restricting her to unskilled work would account for her mental health impairments[,]" *id.*, then the ALJ avoids the "recurring error." In *Martin*, the ALJ tailored the RFC to plaintiff's concentration limitation by finding that she "could maintain the concentration required to perform simple tasks, remember simple work-like procedures, and make simple work-related decisions." *Id*. Next, the ALJ tailored the RFC to plaintiff's persistence limitation by determining that she "could stay on-task and thereby 'meet production requirements.'" *Id*. As for plaintiff's pace limitation, the ALJ tailored the RFC "by stating that [plaintiff] needed flexibility and work requirements that were goal-oriented." *Id*. Thus, the Court found that the "ALJ did not take any of the shortcuts on [the] [plaintiff's] CPP limitations that we have found problematic in other cases." *Id*.

Plaintiff argues that "[t]he RFC finding included mental limits jobs that can be learned in a month, simple decisions, and limited social contact—but nothing reflecting or referencing in any way [Plaintiff's] established moderate persistence impairment." (Doc. 10, p. 9). Indeed, the ALJ noted that Plaintiff has a moderate limitation "[w]ith regard to concentrating, persisting, *or* maintaining pace . . . ." (Tr. 58) (emphasis added).[2] The ALJ acknowledged that "[m]ental status examinations reveal intact memory, attention, and concentration . . . ." (*Id*.). The ALJ also found that the Plaintiff "has the capacity to maintain the attention and concentration to sustain simple work." (*Id*.). After reviewing Plaintiff's medical records, the ALJ noted that "[Plaintiff] can concentrate, persist, and maintain pace

---

[2] Plaintiff correctly points out that "[t]he ALJ did not clarify which of the three was moderately limited and focused the discussion on explanation of why there was no greater impairment." (Doc. 10, p. 8).

sufficiently to sustain the performance of simple, routine tasks and make simple work-related decisions." (Tr. 65).

Plaintiff is correct. The ALJ failed to tailor the RFC to Plaintiff's persistence limitation—even after accepting "the assessments of the non-examining state agency medical consultant[s] as consistent with the objective medical evidence of record and supported by the noted mental status examination findings[.]" (*Id.*). Both state agency medical consultants, DiFonso and Mehr, found that Plaintiff had sustained concentration and persistence limitations. (Tr. 159, 178). Specifically, DiFonso and Mehr observed that Plaintiff's ability to maintain attention and concentration for extended periods was moderately limited. (Tr. 160, 178). Rather than accounting for Plaintiff's persistence limitation, the ALJ took a shortcut by limiting Plaintiff to "simple, routine tasks and mak[ing] simple work-related decisions." (Tr. 65). But "the complexity of a task is not related to the ability to stick with the job for a full shift." *James M. G. v. Comm'r of Soc. Sec.*, 2020 WL 5016790, at *5 (S.D. Ill. Aug. 25, 2020).

The Commissioner argues that "Plaintiff does not say what additional mental limitations the ALJ should have included in the RFC finding to reflect the ALJ's step three finding that Plaintiff had moderate limitations in concentration, persistence, or pace." (Doc. 14, p. 6). This argument misses the point as Plaintiff is attacking the RFC for not reflecting or referencing in any way Plaintiff's persistence limitation. Next, the Commissioner argues that "Plaintiff sidesteps a recent regulatory change that clarifies that the ALJ's finding at step three that Plaintiff had a moderate rating in concentration, persistence or pace did not provide any evidence that Plaintiff needed additional mental limitations beyond those described in the mental RFC finding." (*Id.* at p. 7). The Commissioner's second argument also misses the point. Again, the issue here is the RFC failing to address Plaintiff's persistence

limitation. Finally, the Commissioner cites several "recent decisions that have recognized that limitations virtually identical to the ones described in the RFC finding can reasonably accommodate moderate limitation in concentration, persistence, or pace." (*Id.*). These "recent decisions" are unpersuasive as this case is distinguishable on multiple fronts. Accordingly, the Court finds that the ALJ failed to build the required "logical bridge" from the evidence of Plaintiff's persistence limitation to his conclusions as to Plaintiff's RFC.

## II.     Failing to account for Plaintiff's moderate social deficits in the RFC.

Plaintiff also argues the "ALJ did not include within the RFC finding, and did not address the findings of the state agency [psychological] experts regarding the specific version of social restrictions suffered by [Plaintiff]." (Doc. 10, p. 10). Plaintiff notes that "[a]n ALJ's RFC finding must incorporate other supported findings of social restrictions that would apply at a workplace." (*Id.*). According to Plaintiff, the opinions of Drs. DiFonso and Mehr did not describe Plaintiff's social deficits "as something confined by the *frequency* of social contact at all—and that is such an odd translation as to require more explanation from the ALJ." (*Id.*).

The problem is Plaintiff fails to hypothesize what kinds of work restrictions might address Plaintiff's limitations. *See Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) ("[i]t is unclear what kinds of work restrictions might address Jozefyk's limitations in concentration, persistence, or pace because he hypothesizes none"). Additionally, the Court must reject Plaintiff's argument that the ALJ did not fairly summarize the opinions of the state's experts who detailed that "[Plaintiff] would be moderately impaired both in her 'ability to interact appropriately with the general public' and in her 'ability to accept instructions and respond appropriately to criticism from supervisors.'" (Doc. 10, p. 10) (citing Tr. 160, 178-179). In *Varga*

*v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015), the Court held that the ALJ's RFC "fail[ed] to account for all of [the] [plaintiff's] difficulties maintaining concentration, persistence, and pace, which, as the record shows, were related to her diagnosed anxiety and depression, as well as her physical problems and pain." The Court also acknowledged that "'[f]ew if any work place changes' with *limited 'interaction with coworkers or supervisors'* deals largely with workplace adaptation, rather than concentration, pace, or persistence." *Id*. (emphasis added). In other words, certain social deficits—like workplace adaptation—is something that can be confined by the frequency of social contact. Accordingly, this argument must be rejected.

## Conclusion

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED:** March 30, 2023

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**